TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
VICTOR A. RODGERS
California Bar No. 101281
Assistant United States Attorney
Asset Forfeiture Section
      Federal Courthouse, 14th Floor
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-2569
      Facsimile: (213) 894-0142
      E-mail: Victor.Rodgers@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-CV-03396 |
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE |
| v. | 18 U.S.C. § 981(a)(1)(A) and (C) and 984 and 21 U.S.C. § 881(a)(6) |
| ALL FUNDS IN HANG SANG BANK ACCOUNT NUMBER 774528186883 AND SITUATED IN HONG KONG, | [DEA/IRS] |
| Defendant. | |

      Plaintiff United States of America brings this claim

against defendant All Funds In Hang Sang Bank Account Number

774528186883 And Situated In Hong Kong, and alleges as follows:

1

JURISDICTION AND VENUE

2
3
4

1.    Plaintiff United States of America brings this <u>in</u> <u>rem</u> forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(A) and (C) and 984 and 21 U.S.C. § 881(a)(6).

5
6

2.    This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

7
8

3.    Venue lies in this district pursuant to 28 U.S.C. § 1395.

9

PERSONS AND ENTITIES

10
11

4.    The plaintiff in this action is the United States of America.

12
13
14
15
16
17

5.    The defendant in this action is All Funds In Hang Sang Bank Account Number 774528186883 And Situated In Hong Kong (the "defendant bank funds").  Hang Sang Bank Account Number 774528186883 (the "6883 Account") is a business checking account held by Mare Dey Import and Export Trading Co. and owned and controlled by Hong Zeng.

18
19
20

6.    The interests of Mare Dey Import and Export Trading Co. and Hong Zeng may be adversely affected by these proceedings.

21

BASIS FOR FORFEITURE

22
23
24
25
26
27
28

7.    Beginning in 2015, law enforcement officers conducted an investigation of a money laundering/drug trafficking conspiracy whose members included Jorge Hugo Zavala-Lopez ("Zavala"), Abel Bustamante-Duran also known as Prieto ("Bustamante"), Hong Zeng also known as Alondra China ("Zeng"), Marco Antonio Mendez-Guzman aka Acelerin ("Mendez"), Rafael Omar Cruz-Valedon aka Parce ("Cruz"), an individual whose first and

2

last name are unknown and is also known as Alvarez ("Alvarez"), Erick Giovanny Garcia also known as Juanito ("E. Garcia"), Diana Quiroz Garcia ("D. Garcia"), Juan Carlos Arreola and Ramon Antonio Lopez-Llamas ("Lopez").[1]  As part of the conspiracy, the above-mentioned co-conspirators conducted concealment money laundering transactions within the United States, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), conducted concealment money laundering transactions by transferring funds from a place in the United States to a place outside the United States (namely, China and Mexico), in violation of 18 U.S.C. § 1956(a)(2)(B)(i) and conducted monetary transactions in criminally derived property having a value in excess of $10,000.00, in violation of 18 U.S.C. § 1957.

8.    The objects of the conspiracy were accomplished, in substance, as follows:

a.    Zavala and Bustamante would identify bulk cash drug proceeds in United States currency generated from the sale of drugs in the United States to be repatriated back to the sellers of the drugs in Mexico, China and elsewhere, and would offer commissions to others (the "money laundering contracts") who would be able to transmit the proceeds to the foreign drug sellers.

b.    Zavala and Bustamante would direct those who accepted the money laundering contracts to retrieve United States Currency in the United States and deliver the equivalent

---

[1] The investigation led to the filing on September 8, 2020 of an indictment against the above-referenced co-conspirators. See United States of America v. Zavala-Lopez, Bustamante-Duran, Hong Zeng, et al., Case No. CR 2:20-cr-00405-FMO.

amount, less a commission (i) to couriers in Los Angeles (so the couriers could arrange for the transfer of the funds overseas); or (ii) via wire either to a United States bank account so that the funds could then be wired to a bank account in a foreign country or directly to a bank account in a foreign country.

c.   Zavala and Bustamante would provide those who accepted the money laundering contracts with telephone numbers, code phrases and serial numbers from dollar bills, which items were to be used to contact couriers and confirm identities.

d.   Cruz, Alvarez, D. Garcia and others would act as couriers and intermediaries to deliver bulk cash drug proceeds on behalf of Zavala and Bustamante, in connection with the money laundering contracts.

e.   Mendez, E. Garcia, Arreola, Lopez and others would act as couriers and intermediaries to accept delivery of bulk cash drug proceeds in Los Angeles on behalf of Zavala and Bustamante, in connection with the money laundering contracts.

f.   Zeng would use bank accounts she controlled in the name of Mare Dey Import and Export Trading Co. to accept deposits constituting drug proceeds, in connection with the money laundering contracts offered by Zavala or Bustamante, for the purpose of concealing the nature, source, ownership and control of the proceeds.

9.   The Zeng accounts to which the drug proceeds were transferred consisted of the 6883 Account and another account which, like the 6883 Account, was owned and controlled by Zeng, was situated in Hong Kong, and was in the name of Mare Dey Import and Export Trading Co.  The second account was Hongkong

and Shanghai Banking Corporation Limited account number 817818321838 (the "HSBC 1838 Account").  The 6863 Account and the HSBC 1838 account are hereinafter collectively referred to as the "Zeng Accounts."

10.  During the investigation, law enforcement officers intercepted telephone conversations among the co-conspirators in which the co-conspirators used coded language, and the substance of some of those conversations, as well as other activities the co-conspirators engaged in furtherance of their illegal activities, are set forth below.

October 2015 Dallas Money Laundering Contract

11.  On or about October 14, 2015, during a telephone conversation, Bustamante offered a money laundering contract to collect approximately $70,000.00 in drug proceeds in Dallas, Texas to an individual whom Bustamante believed to be a money launderer but who was, in fact, a confidential informant ("Broker A") working for the Drug Enforcement Administration (the "DEA").

12.  During a telephone conversation on or about October 14, 2015, Bustamante sent Broker A the telephone number of a Dallas based money courier who would be delivering the drug proceeds and a code phrase.

13.  On or about October 15, 2015, a co-conspirator, on behalf of Bustamante, delivered $70,000.00 concealed inside a clock radio box in Dallas to an undercover law enforcement agent posing as Broker A's associate.

14.  During a telephone conversation on or about October 19, 2015, Bustamante provided Broker A the telephone number of

5

Mendez as the Los Angeles based courier to whom Broker A should deliver the drug proceeds.

15.  On or about October 20, 2015, during a telephone conversation, Mendez instructed an undercover law enforcement agent, posing as Broker A's associate, to deliver the funds to Mendez inside a package that was not see-through.

16.  On or about October 20, 2015, Mendez accepted $68,600 in Los Angeles from an undercover law enforcement agent posing as Broker A's associate.

October 2015 Detroit Money Laundering Contract

17.  During a telephone conversation on or about October 27, 2015, Bustamante offered Broker A a money laundering contract to collect approximately $400,000.00 in drug proceeds in Detroit, Michigan, and provided to Broker A the telephone number of the money courier who would be delivering the funds.

18.  On or about October 29, 2015, a co-conspirator, at the behest of and on behalf of Bustamante, delivered $398,970.00 concealed inside a nylon sleeve and a shoebox to a confidential informant working for law enforcement and posing as Broker A's associate.

19.  During a telephone conversation on or about November 1, 2015, Bustamante provided Broker A the telephone number of Mendez as the Los Angeles-based courier to whom Broker A should deliver the drug proceeds.

20.  On or about November 2, 2015, during a telephone conversation, Mendez instructed an undercover law enforcement agent posing as Broker A's associate to deliver the funds to Mendez inside something dark or inside a box.

21.   On or about November 2, 2015, Mendez accepted $390,990.00 representing drug proceeds inside a FedEx package in Los Angeles from an undercover law enforcement agent posing as Broker A's associate.

22.   On or about November 2, 2015, Mendez drove from Los Angeles to the Phoenix, Arizona area with the FedEx package he had accepted earlier that day; the next day, a $300,000.00 cash deposit was made into a Scottsdale, Arizona bank account held by a co-conspirator ("Co-conspirator 1").

23.   On or about November 27, 2015, Co-conspirator 1 caused $200,000.00 in drug proceeds to be sent via wire transfer to the 6883 Account.

24.   On or about November 30, 2015, Co-conspirator 1 caused $153,803.06 in drug proceeds to be sent via wire transfer to the 6883 Account.

<u>March 2016 Boston Money Laundering Contract</u>

25.   During a telephone conversation on or about March 11, 2016, Bustamante offered Broker A a money laundering contract to collect approximately $350,000.00 in drug proceeds in Boston, Massachusetts, and provided to Broker A the telephone number of a Boston based money courier who would be delivering the drug proceeds.

26.   On or about March 13, 2016, during a telephone conversation, Bustamante asked Broker A to open a WhatsApp account so that Bustamante could send Broker A account information for the bank accounts to which Broker A should wire transfer the drug proceeds to be picked up in Boston, to which Broker A provided to Bustamante a WhatsApp account represented

to belong to the individual in charge of wiring funds on behalf
of Broker A, but that was, in fact, being used by an undercover
law enforcement agent posing as Broker A's associate (the "UC
WhatsApp Account").

27.   On or about March 14, 2016, Alvarez, at the behest of
and on behalf of Bustamante, delivered $330,020.00 in drug
proceeds, which were vacuum-sealed inside plastic bags, in
Boston to an undercover law enforcement agent posing as Broker
A's associate.

28.   On or about March 15, 2016, in multiple WhatsApp
messages, Bustamante sent to the UC WhatsApp Account the account
information for the Zeng Accounts.

29.   On or about March 16, 2016, in a WhatsApp message,
Bustamante sent to the UC WhatsApp Account instructions to wire
transfer the drug proceeds delivered in Boston evenly to the two
Zeng Accounts.

30.   During a telephone conversation on or about March 16,
2016, Bustamante requested from Broker A confirmation that funds
had been transferred to the two Zeng Accounts so that
individuals in Hong Kong would provide Bustamante with chemical
precursors used to manufacture drugs.

31.   On or about March 18, 2016, Zeng accepted wire
transfers in the amounts of $158,409.60 and $158,409.60 to the
two Zeng Accounts (i.e., that equal sum was wired to the 6863
Account and the HSBC 1838 account) from an undercover bank
account controlled by the DEA.  Accordingly, the $330,000.00
delivered in Boston on or about March 14, 2016 and mentioned
above was wired, less Broker A's commission, to the Zeng

Accounts with a total of $316,819.20 ($158,409.60 + $158,409.60) received on or about March 18, 2016 in the Zeng Accounts.

March-April 2016 Boston Money Laundering Contract

32.    During a telephone conversation on or about March 21, 2016, Bustamante offered to an undercover law enforcement agent working for the DEA, who Bustamante believed to be the leader of Broker A's money-laundering organization ("UC-1") a money-laundering contract to collect approximately $280,000.00 in drug proceeds in Boston, Massachusetts, and told UC-1 that the funds needed to be wire transferred to Hong Kong.

33.    On or about March 23, 2016, in a WhatsApp message, Bustamante provided to UC-1 the telephone number of Cruz as the money courier who would be delivering the drug proceeds.

34.    On or about March 24 and 25, 2016, during telephone conversations, Cruz told UC-1 that Cruz worked for Mexican drug traffickers who sent him cocaine to deliver in Boston, sold between 15 and 20 kilograms of cocaine per week, sent approximately $5 million in drug proceeds to Mexico each month from drug sales in Boston, and asked UC-1 if UC-1 could supply Cruz with cocaine to sell.

35.    On March 31, 2016, Cruz and Alvarez met in Boston with UC-1 and an undercover DEA agent posing as UC-1's associate ("UC-2"); Cruz and Alvarez told UC-1 and UC-2 that Cruz and Alvarez distributed cocaine on behalf of two Mexican cartels and that they received cocaine in 15- to 20-kilogram shipments and divided the cocaine between each other for further distribution, and offered to pay $30,000 per kilogram for cocaine if UC-1 could supply Cruz and Alvarez with cocaine for sale.

36.    On March 31, 2016, Alvarez delivered $269,999.00 in drug proceeds in Boston to UC-2.

37.    On or about April 2, 2016, in a WhatsApp message, Bustamante instructed UC-1 to wire transfer the funds to the HSBC 1838 Account.

38.    On April 7, 2016, Zeng accepted the wire transfer of $259,199.40 to the HSBC 1838 Account.

<u>May-July 2016 Dallas Money Laundering Contracts</u>

39.    During a telephone conversation on or about May 26, 2016, Bustamante offered to UC-1 a money laundering contract to collect drug proceeds in Dallas, Texas and provided to UC-1 the telephone number of a Dallas based money courier who would be delivering the drug proceeds.

40.    On or about June 2, 2016, after $160,000.00 in drug proceeds were delivered by Bustamante's Dallas-based courier to an undercover law enforcement agent posing as UC-1's associate, Bustamante sent a WhatsApp message to UC-1 with instructions to wire transfer the money picked up in Dallas to four bank accounts controlled by Co-conspirator 1.

41.    On or about June 6, 2016, law enforcement agents wire transferred a total of $156,000 to accounts controlled by Co-conspirator 1, who subsequently wire transferred a total of $257,000.00 to the Zeng Accounts.

42.    During a telephone conversation on or about June 9, 2016, Bustamante offered UC-1 a money-laundering contract to collect approximately $250,000.00 in drug proceeds in Dallas, Texas and provided to UC-1 the telephone number of a Dallas based money courier who would be delivering the drug proceeds.

43.   On or about June 13, 2016, after $250,020.00 in drug proceeds were delivered by Bustamante's courier to an undercover law enforcement agent posing as UC-1's associate, Bustamante sent a WhatsApp message to UC-1 with instructions to wire transfer the money picked up in Dallas to four bank accounts controlled by Co-conspirator 1.

44.   On or about June 17, 2016, after law enforcement agents wire transferred a total of $244,900.00 to accounts controlled by Co-conspirator 1, Co-conspirator 1 wire transferred $188,349.00 to one of the Zeng Accounts.

45.   On or about July 13, 2016, Zavala contacted UC-1 via WhatsApp and offered a money laundering contract to move approximately $120,000.00 in Dallas.  Zavala passed the undercover officer a code and telephone number.

46.   On or about July 18, 2016, another undercover officer called the telephone number and eventually retrieved $109,000.00 from a courier.

47.   On or about July 22, 2016 and at the direction of Zavala, law enforcement officers wired from a law enforcement undercover bank account to the 6883 Account a total of $104,640.00 ($109,000.00 less the laundering commission).

June 2016 Boston Money Laundering Contract

48.   On or about June 9, 2016, Bustamante offered UC-1 a money laundering contract to retrieve approximately $200,000.00 in Boston.  Bustamante provided UC-1 with the telephone number of a Boston courier and a passphrase to coordinate the exchange. Another undercover officer supplied the passcode to the user of the telephone with the telephone number provided by Bustamante,

and the undercover officer eventually retrieved the money from the courier.

49.  On or about June 22, 2016 and at Bustamante's direction, law enforcement officers wired from a law enforcement undercover bank account to the 6883 Account a total of $192,000.00 ($200,000.00 less the laundering commission).

May-July Communications Involving Bustamante, Zavala and Zeng

50.  On or about May 26, 2016, Bustamante forwarded UC-1 a WhatsApp message containing an inquiry from the Hong Kong-based HSBC 1838 Account with questions regarding funds previously transferred to that account from an undercover law enforcement account.

51.  On or about June 3, 2016, Bustamante provided UC-1 with a Chinese telephone number used by Zeng so that UC-1 could contact Zeng directly regarding the bank inquiry.

52.  On or about June 3, 2016, in WhatsApp messages, Zeng informed UC-1 that she needed answers to the Hong Kong-based bank's inquiries to prevent closure of the HSBC 1838 Account.

53.  On or about June 28, 2016, in WhatsApp messages, Zeng requested UC-1's assistance in transferring money between the United States and China, as well as within the United States, for Zavala, and provided UC-1 with a telephone number for Zavala.

54.  During a telephone conversation on or about June 28, 2016, Zavala informed UC-1 that Zavala was Zeng's associate and that the money laundering contracts that UC-1 had previously accepted from Bustamante had, in fact, originated with Zavala.

55.  On or about June 28, 2016, during a telephone

12

conversation, Zavala offered UC-1 future money contracts in the United States and explained that funds for the money laundering contracts were wire-transferred to shell accounts set up by Co-conspirator 1 and then transferred to Hong Kong bank accounts held by Zeng.

56.  On or about July 6, 2016, after Zavala shared Co-conspirator 1's contact information with UC-1, Co-conspirator 1 informed UC-1 that he could set up shell corporations for UC-1 and would charge a commission for his services.

57.  During a telephone conversation on or about July 7, 2016, Zavala told UC-1 that Zavala had an associate in Mexico who could obtain chemicals used to manufacture drugs and that he had an associate who could supply cocaine that was 93% pure for approximately $23,000 per kilogram.

58.  On or about July 16, 2016, in a meeting in Thailand, Zeng informed UC-1 and UC-2 that Zeng wanted to avoid problems with bank transactions by limiting the amounts of transactions and confirmed with UC-1 and UC-2 that the money she was accepting on behalf of Zavala and Bustamante in the bank accounts she controlled represented drug proceeds.

59.  On or about July 26, 2016, in a meeting in Los Angeles, California, Zavala discussed with UC-1, UC-2, and a confidential informant working for the DEA posing as UC-1's transportation coordinator ("Coordinator A"), a potential money-laundering contract to transfer approximately $1 million from Los Angeles to Bogota, Colombia.

60.  On or about July 26, 2016, in a meeting in Los Angeles, California, Zavala discussed with Coordinator A

potential future transactions to transport and distribute cocaine and other drugs from Los Angeles to other cities in the United States.

August 2016 El Segundo, California Money Laundering Contract

61.  On or about August 24, 2016, in WhatsApp messages, Zavala offered UC-1 a money-laundering contract to collect drug proceeds in Los Angeles, California and provided to UC-1 the California driver's license of D. Garcia, who Zavala identified as the Los Angeles-based money courier who would be delivering the drug proceeds.

62.  On or about August 24, 2016, D. Garcia called the telephone number of an undercover law enforcement agent posing as UC-1's associate and attempted to arrange the delivery of the drug proceeds.

63.  On or about August 24, 2016, in El Segundo, California, D. Garcia delivered $99,480.00 in drug proceeds to an undercover law enforcement agent posing as UC-1's associate.

64.  On or about August 25, 2016, in a WhatsApp message, Zavala instructed UC-1 to wire transfer the funds to several bank accounts controlled by Co-conspirator 1, which funds totaling $96,480.00 ($99,480.00 less a $3,000.00 commission) were subsequently transferred to accounts controlled by Co-conspirator 1 as instructed.

65.  On or about August 30, 2016, Co-conspirator 1 caused $48,556.09 to be sent via wire transfer to a bank account.

66.  On or about September 2, 2016, Co-conspirator 1 caused $49,901.97 to be sent via wire transfer to one of the Zeng Accounts.

<u>Background Regarding The Illegality Of Engaging In Money</u>
<u>Transmitting Without A License</u>

67.  18 U.S.C. § 1960 makes it a crime to knowingly conduct, control, manage, supervise, direct or own all or part of an unlicensed money transmitting business.  In addition, 18 U.S.C. § 981(a)(1)(A) renders subject to forfeiture any property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1960, or any property traceable to such property.

68.  Pursuant to 18 U.S.C. § 1960(b)(1), an unlicensed money transmitting business is defined as one which affects interstate or foreign commerce in any manner or degree and (a) is operated without an appropriate license in a state, such as California, where such operation is punishable under state law, whether or not the transmitter knew that the operation was required to be licensed; (b) is not in compliance with the money transmitting business registration requirements under 31 U.S.C. § 5330 (which requires that money transmitting businesses be registered with the Secretary of the Treasury), or the regulations promulgated thereunder; or (c) otherwise involves the transportation or transmission of funds that are known by the transmitter to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity. Money transmitting is defined as transferring funds on behalf of the public by any and all means including, but not limited to transfers within the United States or to locations abroad by wire, check, draft, facsimile or courier.

69.  As set forth above, the defendant bank funds was transmitted or attempted to be transmitted on behalf of a third

1  party by Bustamante and Zavala and received by Zeng.  However,
2  neither Bustamante, Zavala nor Zeng during the time of the
3  operative events set forth above were authorized to function as
4  a money transmitting business under state law or federal law by
5  the Secretary of the Treasury.

6      70.  Nevertheless Bustamante, Zavala and Zeng knowingly
7  conducted, controlled, managed, supervised, directed and owned
8  an unlicensed money transmitting business affecting interstate
9  and foreign commerce: (a) having failed to obtain an appropriate
10  money transmitting license under State law; (b) having failed to
11  comply with the money transmitting business registration
12  requirements under 31 U.S.C. § 5330, and the regulations
13  prescribed thereunder; and (c) having knowingly transported or
14  transmitted funds derived from a criminal offense or which were
15  intended to be used to promote or support unlawful activity.

16                    FIRST CLAIM FOR RELIEF

17      71.  Plaintiff incorporates the allegations of paragraphs
18  1-70 above as though fully set forth herein.

19      72.  Based on the above, plaintiff alleges that the
20  defendant bank funds represents or is traceable to proceeds of
21  illegal narcotic trafficking, was intended to be used in one or
22  more exchanges for a controlled substance or listed chemical, or
23  was used or intended to be used to facilitate a controlled
24  substance or listed chemical violation, in violation of 21
25  U.S.C. § 841 et seq.  The defendant bank funds is therefore
26  subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6). In
27  addition, to the extent that the defendant bank funds is not the
28  actual monies directly traceable to the illegal activity

identified herein, plaintiff United States of America alleges that the defendant bank funds is identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

## SECOND CLAIM FOR RELIEF

73.  Plaintiff incorporates the allegations of paragraphs 1-70 above as though fully set forth herein.

74.  Based on the above, plaintiff alleges that the defendant bank funds constitutes or is derived from proceeds traceable to a controlled substance or listed chemical violation, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D).  The defendant bank funds is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). In addition, to the extent that the defendant bank funds is not the actual monies directly traceable to the illegal activity identified herein, plaintiff United States of America alleges that the defendant bank funds is identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

## THIRD CLAIM FOR RELIEF

75.  Plaintiff incorporates the allegations of paragraphs 1-70 above as though fully set forth herein.

76.  Based on the above, plaintiff alleges that the defendant bank funds constitutes property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i) or 18 U.S.C. § 1956(a)(2)(B)(i), or property

traceable to such property, with the specified unlawful activity being a controlled substance or listed chemical violation.   The defendant bank funds is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).   In addition, to the extent that the defendant bank funds is not the actual monies directly traceable to the illegal activity identified herein, plaintiff United States of America alleges that the defendant bank funds is identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

### FOURTH CLAIM FOR RELIEF

77.   Plaintiff incorporates the allegations of paragraphs 1-70 above as though fully set forth herein.

78.   Based on the above, plaintiff alleges that the defendant bank funds constitutes property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1957(a), or property traceable to such property, with the specified unlawful activity being a controlled substance or listed chemical violation.   The defendant bank funds is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).   In addition, to the extent that the defendant bank funds is not the actual monies directly traceable to the illegal activity identified herein, plaintiff United States of America alleges that the defendant bank funds is identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

1

<u>FIFTH CLAIM FOR RELIEF</u>

2     79.  Plaintiff incorporates the allegations of paragraphs

3  1-70 above as though fully set forth herein.

4     80.  Based on the above, plaintiff alleges that the

5  defendant bank funds constitutes or is derived from proceeds

6  traceable to violations of 18 U.S.C. § 1960 (illegal money

7  transmitting business), which is a specified unlawful activity

8  as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B).  The

9  defendant bank funds is therefore subject to forfeiture pursuant

10  to 18 U.S.C. § 981(a)(1)(C).  In addition, to the extent that the

11  defendant bank funds is not the actual monies directly traceable

12  to the illegal activity identified herein, plaintiff United

13  States of America alleges that the defendant bank funds is

14  identical property found in the same account or place as the

15  property involved in the specified offense, rendering the

16  defendant bank funds subject to forfeiture pursuant to 18 U.S.C.

17  § 984.

18

<u>SIXTH CLAIM FOR RELIEF</u>

19     81.  Plaintiff incorporates the allegations of paragraphs

20  1-70 above as though fully set forth herein.

21     82.  Based on the above, plaintiff alleges that the

22  defendant bank funds constitutes property involved in multiple

23  transactions or attempted transactions in violation of 18 U.S.C.

24  § 1956(a)(1)(B)(i) or 18 U.S.C. § 1956(a)(2)(B)(i), or property

25  traceable to such property, with the specified unlawful activity

26  being violations of 18 U.S.C. § 1960 (illegal money transmitting

27  business).  The defendant bank funds is therefore subject to

28  forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).  In addition,

to the extent that the defendant bank funds is not the actual monies directly traceable to the illegal activity identified herein, plaintiff United States of America alleges that the defendant bank funds is identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

SEVENTH CLAIM FOR RELIEF

83.  Plaintiff incorporates the allegations of paragraphs 1-70 above as though fully set forth herein.

84.  Based on the above, plaintiff alleges that the defendant bank funds constitutes property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1957(a), or property traceable to such property, with the specified unlawful activity being violations of 18 U.S.C. § 1960 (illegal money transmitting business).  The defendant bank funds is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).  In addition, to the extent that the defendant bank funds is not the actual monies directly traceable to the illegal activity identified herein, plaintiff United States of America alleges that the defendant bank funds is identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

WHEREFORE, plaintiff United States of America prays:

(a)  that an arrest warrant in rem in the form submitted with this Verified Complaint for Forfeiture be issued to the Attorney General of the United States or his duly authorized

1  representative (including, but not limited to, the Internal

2  Revenue Service and the Drug Enforcement Administration) to

3  arrest the defendant bank funds;

4      (b)  that due process issue to enforce the forfeiture of

5  the defendant bank funds;

6      (c)  that due notice be given to all interested parties to

7  appear and show cause why forfeiture should not be decreed;

8      (d)  that this Court decree forfeiture of the defendant

9  bank funds to the United States of America for disposition

10  according to law; and

11      (e)  for such other and further relief as this Court may

12  deem just and proper, together with the costs and disbursements

13  of this action.

14  Dated: April 21, 2021        TRACY L. WILKISON
                                 Acting United States Attorney
15                               BRANDON D. FOX
                                 Assistant United States Attorney
16                               Chief, Criminal Division
                                 STEVEN R. WELK
17                               Assistant United States Attorney
                                 Chief, Asset Forfeiture Section

18

19                               _____

20                               VICTOR A. RODGERS
                                 Assistant United States Attorney
                                 Asset Forfeiture Section
21
                                 Attorneys for Plaintiff
22                               UNITED STATES OF AMERICA

23

24

25

26

27

28

VERIFICATION

I, Jennifer Caruth, hereby declare that:

1.   I am a Special Agent with the Internal Revenue Service.

2.   I have read the above Complaint for Forfeiture and know the contents thereof.

3.   The information contained in the Complaint is either known to me personally, was furnished to me by official government sources, or was obtained pursuant to subpoena.   I am informed and believe that the allegations set out in the Complaint are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on *April 7*, 2021 at *Los Angeles*, California.

Jennifer Caruth